**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MARCELLA FUTIA,**

          **Plaintiff,**

        **vs.**

**MICHAEL J. ASTRUE**, Commissioner of Social
Security Administration,[1]

          **Defendant.**
_____

**1:06-CV-0961**
**(NAM)**

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| *For Plaintiff* <br> Erwin, McCane & Daly <br> 23 Elk Street <br> Albany, New York 12207 | Thomas C. Erwin, Esq. |
| *For Defendant* <br> Andrew T. Baxter <br> Acting United States Attorney for <br> the Northern District of New York <br> P.O. Box 7198 <br> 100 South Clinton Street <br> Syracuse, New York 13261-7198 | Karen G. Fiszer, Esq. |
| Social Security Administration <br> Office of Regional General Counsel <br> Region II <br> 26 Federal Plaza - Room 3904 <br> New York, New York 10278 | Barbara L. Spivak, Esq. |

---

     [1] Michael J. Astrue became Commissioner of Social Security on February 12, 2007.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael J. Astrue is substituted as the Defendant in this suit.

**Norman A. Mordue, Chief Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

In this action, plaintiff Marcella Futia, moves, pursuant to 42 U.S.C. § 405(g), for a review of a decision by the Commissioner of Social Security denying plaintiff's applications for disability benefits. (Dkt. No. 1). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

**II.     FACTUAL BACKGROUND**

Plaintiff was born on January 10, 1956 and was 49 years old at the time of the administrative hearing on March 2, 2005. (Administrative Transcript at p. 49, 138)[2]. At the time of the hearing, plaintiff testified that she resided with her husband and two children, ages 24 and 25, in the first floor of a two-family home. (T. 36-37). In 1974, plaintiff came to the United States from Italy. (T. 54). Plaintiff does not have a high school diploma or an equivalency degree. (T. 44). From 1992 until 2001, plaintiff was employed as a seamstress. (T. 34, 161). Plaintiff claims that she became disabled on July 7, 2001 as a result of injuries she allegedly sustained in a motor vehicle accident. (T. 140). Plaintiff allegedly suffered nerve damage in her neck, right arm and hand. (T. 19). The last day plaintiff was employed in any capacity was July 7, 2001. (T. 159).

**A.      Medical Evidence**[3]

On July 7, 2001, plaintiff appeared at the emergency room of Albany Medical Center after a motor vehicle accident. (T. 240). Plaintiff complained of neck pain, back pain and numbness in her right arm and hand. (T. 240). The attending physician noted that x-rays of plaintiff's cervical

---

[2] Portions of the administrative transcript, Dkt. No. 5, will be cited herein as "(T.  )".

[3] The record contains treatment notes from doctors and/or facilities for illnesses/conditions that are unrelated to the issues at hand. A summary of those records has been omitted from this discussion.

2

spine were negative for a fracture. (T. 243). Plaintiff was diagnosed with a "neck muscle injury". (T. 242).

On July 9, 2001, plaintiff was examined by Nilofar Q. Mir, M.D., her primary care physician. (T. 325). Plaintiff complained of right shoulder pain. (T. 325). Dr. Mir gave plaintiff a sling for her right shoulder and advised her to return in a few days. (T. 325). On July 19, 2001, Dr. Mir referred plaintiff to an orthopedist as she continued to have pain in her right shoulder and neck. (T. 327).

On August 1, 2001, plaintiff was examined by Suheil M. Khuri, M.D., an orthopedist affiliated with Northeast Orthopaedics. (T. 329). Dr. Khuri requested x-rays of plaintiff's shoulder which were negative. (T. 329). Dr. Khuri diagnosed plaintiff with a cervical and right shoulder sprain and prescribed Flexeril and physical therapy.[4] (T. 329). Plaintiff received 9 therapy treatments at the rehabilitation center at Northeast Orthopaedics. (T. 333). On August 22, 2001, plaintiff returned to Dr. Khuri and advised that despite therapy and medications, she still felt pain. (T. 337). Upon examination, Dr. Khuri noted plaintiff's shoulder and neck were still "stiff" but that her neurological exam was "not definite for anything definite with weakness in her arm in general". (T. 337). Dr. Khuri advised plaintiff to continue with medication and therapy. (T. 337). On September 17, 2001, plaintiff returned to Dr. Khuri complaining of "numbness and tingling" in her hand and continued pain and stiffness in her shoulder and neck. (T. 338). Dr. Khuri ordered an EMG, nerve conduction studies, and an MRI. (T. 338). On September 21, 2001, an MRI of plaintiff's right shoulder was performed at Adirondack Diagnostic Imaging. (T. 343). The MRI of plaintiff's shoulder revealed tendinopathy but no cuff tear. (T. 339). On September 24, 2001, an EMG was performed which revealed "normal" conduction studies. (T. 345). On

---

[4] Flexeril is a skeletal muscle relaxant for relief of muscle spasms. *Dorland's Illustrated Medical Dictionary,* 465, 72 (31st ed. 2007).

September 26, 2001, Dr. Khuri injected plaintiff's shoulder with Kenalog and Marcaine.[5] (T. 339). On October 1, 2001, Dr. Khuri's partner, Dr. Joseph Fay, referred plaintiff to a physiatrist due to her "severe pain in the right shoulder area". (T. 340).

On October 9, 2001, plaintiff was examined by Joy L. Meyer, M.D. at Physical Medicine and Rehabilitation. (T. 346). Plaintiff complained of pain in the right side of her neck going down to her shoulder with tingling in her hands. (T. 346). Upon examination, Dr. Meyer noted plaintiff had decreased range of motion in her right shoulder but, "with distraction", plaintiff was able to fully abduct her right arm, flex her right arm and shoulder and hold up its full weight. (T. 347). Dr. Meyer diagnosed plaintiff with a whiplash injury with ligamental strain, myofascial pain and complex regional pain syndrome in her hand/shoulder with swelling in her hand. (T. 347). Dr. Meyer found no "true findings of the shoulder" and prescribed Prednisone and Neurontin.[6]

On October 23, 2001, plaintiff returned to Dr. Meyer. (T. 349). Upon examination, Dr. Meyer noted plaintiff's right hand was swollen and puffy with a decreased range of motion in her wrist. (T. 349). Dr. Meyer advised plaintiff to continue with her medications and prescribed physical therapy 2-3 times a week for 6 weeks. (T. 350). Dr. Meyer also prescribed an anti-depressant. (T. 350).

On November 13, 2001, plaintiff returned for a follow-up with Dr. Meyer. (T. 351). Plaintiff told Dr. Meyer that she had no improvement with her pain. (T. 351). Plaintiff had

---

[5] Kenalog is an anti-inflammatory injection used for a variety of disorders. *Dorland's* at 992, 1986. Marcaine is used as a local anesthetic for infiltration, peripheral nerve block and epidural anesthesia. *Id.* at 265, 1121.

[6] Prednisone is used in replacement therapy as an anti-inflammatory for a variety of conditions. *Id.* at 1531. Neurontin is an anticonvulsant used in the treatment of partial seizures. *Id.* at 764, 1287.

stopped taking Neurontin due to side effects but advised that she was taking Ultram.[7] (T. 351). Dr. Meyer noted plaintiff did not respond well to medication or therapy and prescribed Klonopin.[8] (T. 351). On November 19, 2001, plaintiff returned to Dr. Meyer and stated that she had "good benefits" from Klonopin without headaches. (T. 353). Dr. Meyer diagnosed plaintiff with complex regional pain syndrome in her right upper limb (RSD), inability to use her right arm and hand and whiplash.[9]

On January 18, 2002, plaintiff was evaluated by Sanjay Chaudhry, M.D. at Pain Management Consultants upon referral from Dr. Meyer. (T. 363). Dr. Chaudhry diagnosed plaintiff with myofascial pain syndrome and possible RSD of the right upper extremity. (T. 364). Dr. Chaudhry scheduled plaintiff for a triple phase bone scan and prescribed a TENS unit.[10] (T. 365). On January 30, 2002, plaintiff underwent a bone scan at St. Peter's Hospital. (T. 365). The radiologist concluded "[t]his study does not suggest RSD of the shoulders". (T. 362). The radiologist suggested that the "uptake in the left side" may be due to trauma. (T. 362). On March 29, 2002, plaintiff received her TENS unit. (T. 359).

On April 8, 2002, plaintiff returned to Dr. Meyer. (T. 390). Dr. Meyer noted plaintiff was not taking her medications regularly. (T. 390). Dr. Meyer referred plaintiff to Dr. Edward Apicella. (T. 390). On May 2, 2002, plaintiff was admitted to Albany Memorial Hospital for a

---

[7] Ultram is used for the treatment of moderate to moderately severe pain following surgical procedures. *Dorlands's* at 2027.

[8] Klonopin is administered orally and used in the treatment of panic disorders. *Id.* at 379, 1003.

[9] RSD is an abbreviation for reflex sympathetic dystrophy. http://www.medilexicon.com (last visited September 11, 2008). RSD is also known as Complex Regional Pain Syndrome (Type 1) which is a chronic pain syndrome of uncertain pathogenesis usually affecting an extremity and characterized by intense burning pain, changes in skin color and texture, sensitivity and edema. It often follows tissue injury but without demonstrable nerve injury. *Id.* at 1851.

[10] TENS is transcutaneous electrical nerve stimulation. *Id.* at 1905.

5

Right Stellate Ganglion Block administered by Edward M. Apicella, M.D. (T. 395). On July 22, 2002, plaintiff had a follow up visit with Dr. Apicella and stated that she did not have lasting relief from the block. (T. 306). Upon examination, Dr. Apicella found no signs of RSD. (T. 397). Dr. Apicella diagnosed plaintiff with whiplash injury with cervicogenic pain. (T. 397). Dr. Apicella suggested a cervical medial branch nerve block and advised plaintiff to continue with her medications.

On May 17, 2002, plaintiff returned to Dr. Meyer complaining of significant pain. (T. 422). Dr. Meyer noted plaintiff's arm and right hand were swollen and suggested plaintiff return to Dr. Apicella for a repeat block. (T. 422). Dr. Meyer prescribed physical therapy and advised plaintiff to continue with her medication. (T. 422). On June 18, 2002, Dr. Meyer re-examined plaintiff and prescribed Lortab.[11] (T. 392).

On December 10, 2002 and January 24, 2003, plaintiff returned to Dr. Apicella's office and was examined by Pamela Madej, R.N. (T. 501-502). Nurse Madej diagnosed plaintiff with cervical posterior joint syndrome secondary to whiplash and scheduled plaintiff for a cervical block with Dr. Apicella. (T. 501). On January 30, 2003, plaintiff was admitted to Albany Memorial Hospital for a cervical medial branch nerve block performed by Dr. Apicella. (T. 496). Dr. Apicella's post-operative diagnosis was posterior joint syndrome/facet syndrome. (T. 496). On February 19, 2003, plaintiff returned to Nurse Madej complaining of right shoulder and arm pain. (T. 504). Plaintiff stated that the block provided 3 days of relief. (T. 504). Nurse Madej provided plaintiff with information regarding cervical radiofrequency denervation. (T. 504). On July 8, 2003, plaintiff had her last visit with Dr. Apicella's office and was examined by Dr.

---

[11] Lortab is a semisynthetic opioid analgesic derived from codeine but having more powerful sedative and analgesic effects. *Dorland's* 890, 1090.

Apicella. (T. 544). Dr. Apicella noted plaintiff was scheduled for radiofrequency lesioning in August.[12] (T. 544).

On November 3, 2003, plaintiff was examined by Dr. Meyer. (T. 429). Dr. Meyer noted plaintiff did not proceed with the radiofrequency procedure and discontinued taking all of her medications with the exception of Lortab. (T. 429). On March 15, 2004, plaintiff returned to Dr. Meyer and advised that she could not continue to receive physical therapy as she could not afford the co-payments. (T. 566). Dr. Meyer prescribed Zanaflex, Lortab, Neurontin and Effexor.[13] (T. 566). On November 30, 2004, Dr. Meyer forwarded a letter to plaintiff discharging plaintiff from Dr. Meyer's care due to plaintiff's "lack of compliance with appointments". (T. 562).

### B.     Consultative Examinations

Amelita Balagtas, M.D.

On April 9, 2002, plaintiff was examined by Dr. Balagtas, an orthopedist, at the request of the agency. (T. 372). Plaintiff complained of neck and right shoulder pain radiating to her arm and hand. (T. 372). Dr. Balagtas diagnosed plaintiff with neck and shoulder pain. (T. 372). Dr. Balagtas noted that an x-ray of plaintiff's cervical spine revealed no bony or disc space pathology and an x-ray of plaintiff's right shoulder was "unremarkable". (T. 374). Dr. Balagtas opined that plaintiff's would have "some limitations" in activities that required lifting and overhead activities and "some limitation" in activities that required lifting, carrying and reaching with the right upper

---

[12] The record does not contain any reports/notations of any treatment by Dr. Apicella after July 2003 and no evidence that plaintiff ever received denervation therapy.

[13] Zanaflex is used as a short-acting agent to manage the increased muscle tone associated with spasticity, as that related to multiple sclerosis or spinal cord injury. *Dorland's* at 1958, 2119. Effexor is used as an antidepressant and antianxiety agent. *Id.* at 602, 2074.

7

extremity. (T. 374).   On December 21, 2004, Dr. Balagtas re-evaluated plaintiff.  (T. 560).  Dr. Balagtas opinions and medical source statement were unchanged.  (T. 560).

Annette Payne, Ph.D.

On December 21, 2004, Dr. Payne performed an intellectual evaluation at the request of the agency. (T. 553).  Plaintiff advised that she could not read or write in English. (T. 553). Plaintiff denied a history of any psychiatric treatment.  (T. 553).  Plaintiff stated she needed assistance with self care and that her daughter did 90% of the cooking, cleaning, laundry and shopping.  (T. 553).  Dr. Payne concluded that plaintiff's full scale IQ was 69 and diagnosed plaintiff as mildly mentally retarded. (T. 555).  Dr. Payne opined that plaintiff could follow and understand simple directions/instructions and plaintiff could perform simple tasks but had problems with attention and concentration. (T. 556).  Dr. Payne concluded that plaintiff would have difficulties learning new tasks or performing complex tasks, making decisions, relating with others and dealing with stress.  (T. 556).

**C.     Physical Residual Functional Capacity ("RFC") Assessments**

On May 9, 2002, Glenn Van Acker, a disability analyst, prepared a Physical RFC Assessment for the agency.[14] (T. 376).  Mr. Van Acker noted plaintiff's primary diagnosis as "possible RSD". (T. 376).  Mr. Van Acker opined that plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (T. 377).  Mr. Van Acker concluded that plaintiff could stand and/or walk and sit for about 6 hours in an 8 hour workday and that plaintiff's ability to push and/or pull was unlimited. (T. 377).  Mr. Van Acker noted plaintiff could occasionally climb, stoop, kneel, crouch and crawl and could frequently balance. (T. 378).

---

[14] The record does not contain Mr. Van Acker's certifications or qualifications.

Mr. Van Acker concluded that plaintiff was limited in reaching in all directions (including overhead) but unlimited in all other areas of manipulation. (T. 379).

On January 13, 2003, Carole A. Wakeley, M.D., provided a medical assessment at the request of the New York State Office of Temporary and Disability Assistance. (T. 404). Dr. Wakeley concluded that plaintiff could sit for 6 hours out of an 8 hour workday and could lift 20 pounds. (T. 404).

On January 14, 2003, R. Friedlander, a state agency medical consultant, prepared a Physical RFC Assessment at the request of the agency.[15] (T. 410). Friedlander's assessments were identical to the conclusions of Mr. Van Acker. (T. 406-408).

## III.   PROCEDURAL HISTORY

On March 15, 2002 and November 20, 2002, plaintiff filed applications for disability insurance benefits ("DIB"). (T. 142, 145). On May 10, 2002 and January 16, 2003, the applications were denied. (T. 91, 94). Plaintiff requested a hearing which was held before an Administrative Law Judge ("ALJ") on April 23, 2004. (T. 30-48). On May 21, 2004, ALJ Joseph F. Gibbons issued a decision denying plaintiff's claims for benefits. (T. 111-118). On September 22, 2004, the Appeals Council granted plaintiff's request for a review. (T. 122). The Appeals Council issued an Order vacating the prior decision and remanding the case to the ALJ. (T. 122). Pursuant to the Order, upon remand, the ALJ was directed to obtain additional evidence concerning claimant's impairments including a consultative orthopedic examination and medical source statements; provide appropriate rational with references to the evidence of record in support of plaintiff's RFC and limitations; clarify the issue of claimant's literacy; and obtain evidence from a vocational expert. (T. 123). On March 2, 2005, a second hearing was held

---

[15] The record does not contain Friedlander's certifications or qualifications.

before the ALJ. (T. 49). On March 22, 2005, the ALJ issued a decision denying plaintiff's claims for benefits. (T. 19-29). The Appeals Council denied plaintiff's second request for review, rendering the ALJ's decision the final determination of the Commissioner. (T. 74). Exhausting all her options for review through the Social Security Administration's tribunals, plaintiff brings this appeal. (Dkt. No. 1).

### IV.    ADMINISTRATIVE LAW JUDGE'S DECISION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities." The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

In this case, the ALJ found at step one that plaintiff has not engaged in substantial gainful activity since her alleged onset date. (T. 20). At step two, the ALJ concluded that plaintiff's whiplash injury, rotator cuff tendinitis and subacromial bursitis were medically determinable impairments. (T. 20). At the third step of the analysis, the ALJ determined that plaintiff's

10

impairments did not meet or equal the severity of any impairment listed in Appendix 1 of the Social Security Regulations (the "Regulations"). (T. 23). At the fourth step, the ALJ found that plaintiff had the RFC to:

> perform a wide range of unskilled light and sedentary work that does not require writing or reading in English. The claimant is able to understand and follow verbal directions. The claimant is precluded from activities that require overhead use of the right arm. She could use her right upper extremity for occasional reaching, grasping, and fine manipulation. The claimant is able to sit for six hours in an eight hour workday with normal breaks and stand and/or walk for six hours in an eight hour workday with normal breaks. She must be able to change positions as needed throughout the day . (T. 24).

Accordingly, the ALJ concluded that plaintiff was no longer able to perform her past relevant work. (T. 26). Since plaintiff's limitations precluded the performance of the full range of light work, the ALJ obtained the testimony of a vocational expert to determine whether there were jobs plaintiff could perform. Based upon the vocational expert's testimony, the ALJ concluded at step five, that there were a significant number of jobs in the regional and national economy that plaintiff could perform, such as work as a new account clerk, order clerk, surveillance systems monitor, messenger, parking lot attendant and hand packer. (T. 28). Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act. (T. 28).

## V.     DISCUSSION

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

11

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that: (1) the ALJ's decision regarding plaintiff's credibility was improper; (2) the ALJ's RFC determination is not supported by substantial evidence; and (3) the ALJ relied upon the vocational expert's response to a defective hypothetical and thus, the Commissioner did not sustain his burden of proof at step five of the sequential evaluation process. (Dkt. No. 7).

### A. Credibility

Plaintiff argues that the ALJ did not make a proper determination with regard to plaintiff's statements and allegations of severe neck, right shoulder and right upper extremity pain.[16] (Dkt. No. 7, p. 8). Plaintiff argues that the ALJ failed to consider plaintiff's exertional, postural and non-exertional limitations.[17] (Dkt. No. 7, p. 8). The Commissioner claims that the ALJ properly considered all of the relevant evidence before concluding that plaintiff's allegations were not supported by the record. (Dkt. No. 11, p. 4).

It is well settled that "a claimant's subjective evidence of pain is entitled to great weight where . . . it is supported by objective medical evidence". *Simmons v. U.S.R.R. Retirement Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (citations omitted). "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques." *Casino-Ortiz v. Astrue*, 2007 WL 2745704, at *11, n. 21 (S.D.N.Y. 2007) (citing 20 C.F.R. § 404.1529(c)(2)). A claimant's subjective symptoms must be supported by medical signs or conditions that reasonably could be expected to produce the disability or alleged symptoms based on a consideration of all the evidence. *Pareja v. Barnhart*, 2004 WL 626176, at *10 (S.D.N.Y. 2004) (concluding that despite plaintiff's subjective complaints, the ALJ noted that

---

[16] Plaintiff cites to no legal authority to support this argument.

[17] Plaintiff did not specify her alleged exertional, postural and non-exertional limitations.

12

several physicians determined that plaintiff could do medium work based on her medical records and on their own evaluations of her test results).

If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with her pain is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony. *Martone v. Apfel*, 70 F. Supp.2d 145, 151 (N.D.N.Y. 1999); *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  An ALJ rejecting subjective testimony must do so explicitly and with specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence.  *Melchior v. Apfel*, 15 F.Supp.2d 215, 219 (N.D.N.Y. 1998) (quoting *Brandon v. Bowen*, 666 F.Supp 604, 608 (S.D.N.Y. 1987)) (citations omitted).   Social Security Ruling 96-7P provides:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7P, 1996 WL 374186, at *2 (SSA 1996); *see also Cloutier v. Apfel*, 70 F.Supp.2d 271, 278 (W.D.N.Y. 1999) (holding that although the ALJ's decision contained a discussion of the

13

medical evidence and a summary of the plaintiff's subjective complaints, the decision did not provide a sufficient analysis of the evidence to support the lack of credibility finding).

In this matter, after reviewing the Administrative Transcript in its entirety, the Court finds that the ALJ did not properly assess plaintiff's credibility. The ALJ failed to make a specific statement regarding plaintiff's credibility and simply noted:

> The undersigned finds that the claimant's allegations regarding her limitations are [sic] do not support limitations greater than those reported in the residual functional capacity. (T. 28).

This statement does not explain the basis for the ALJ's credibility determination under 20 C.F.R. § 404.1529 or Social Security Ruling 96-7p. Throughout the decision, the ALJ discussed the lack objective medical evidence and normal clinical findings of both treating and consultative examiners. However, in addition to objective evidence, the ALJ was required to consider the factors enumerated in 20 C.F.R. § 404.1529(c)(3)(i)-(iv). *See Perez v. Barnhart,* 440 F.Supp.2d 229, 234-235 (W.D.N.Y. 2006) (citing *Curran-Kicksey v. Barnhart*, 315 F.3d 964, 968 (8th Cir. 2003)) (holding that the lack of objective medical evidence is one factor to consider in evaluating claimant's credibility). It is unclear from the decision whether or not the ALJ properly considered these factors. The ALJ did not summarize or analyze plaintiff's subjective complaints of pain. The ALJ failed to evaluate or even discuss plaintiff's daily activities; medication; the location and severity of pain; aggravating factors; or other treatment measures. The ALJ cited to plaintiff's hearing testimony only as it related to her ability to understand, read and write in English. The ALJ failed to cite or discuss any other portion of plaintiff's testimony despite the fact that plaintiff testified twice before the ALJ. (T. 30-48; 49-86).

The Court notes that the ALJ's prior decision of May 21, 2004 contained a more detailed discussion of plaintiff's credibility and the factors outlined in 20 C.F.R. § 404.1529. (T. 115-

14

116). However, an ALJ making a decision in a case on remand from the Appeals Council is to consider the case *de novo* when the Appeals Council has vacated the ALJ's previous decision. *Uffre v. Astrue*, 2008 WL 1792436, at *7 (S.D.N.Y. 2008). In this case, the Appeals Council vacated the ALJ's first decision. (T. 122). Thus, the first decision is immaterial in this proceeding. *See also O'Connor v. Heckler*, 613 F.Supp. 1043, 1046-1047 (D.C.N.Y. 1985) (holding that reliance upon the summary and evaluations of a vacated opinion constitutes a "clear error of judgment".).

Consequently, the Court is left with no basis upon which to determine whether the appropriate legal standards were applied, nor can it evaluate whether the ALJ considered the entire evidentiary record in arriving at his conclusion. *See Harrison v. Secretary of Health and Human Services*, 901 F. Supp. 749, 757 (S.D.N.Y. 1995). It is impossible to determine whether the ALJ improperly discredited plaintiff's complaints of pain on the grounds that they were not supported by objective medical evidence or because they were not supported by her medical history, diagnosis, daily activities, efforts to work and any functional limitations or restrictions caused by the pain. *See* 20 C.F.R. § 404.1529; *see also Cloutier*, 70 F.Supp.2d at 278. As a result, the Court remands this case for a determination of plaintiff's credibility which must contain specific findings based upon substantial evidence in a manner that enables effective review.

**B.   RFC Assessment**

Plaintiff argues that the ALJ's RFC assessment did not include the non-exertional factors found by Dr. Payne.[18]  (Dkt. No. 7, p. 11). Plaintiff also argues that substantial evidence does not support the ALJ's conclusion that plaintiff can meet the exertional demands of light and sedentary

---

[18] Plaintiff does not provide object to the weight the ALJ assigned to Dr. Payne's opinions or to the opinions of any treating or consulting physician or non-examining analyst.

15

work with normal breaks.[19] (Dkt. No. 7, p. 11).  The Commissioner argues that the ALJ properly declined to assign "great weight" to Dr. Payne's opinions and that the ALJ properly relied upon the opinions of Dr. Wakeley and Dr. Balagtas as support for the RFC finding. (Dkt. No. 11, p. 9, 11).

Residual functional capacity is:

> "what an individual can still do despite his or her limitations . . . .  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)).  In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis.  20 C.F.R. § 404.1545(a)**.**

In this case, the ALJ found that plaintiff had the RFC to:

> perform a wide range of unskilled light and sedentary work that does not require writing or reading in English.  The claimant is able to understand and follow verbal directions.  The claimant is precluded from activities that require overhead use of the right arm.  She could use her right upper extremity for occasional reaching, grasping, and fine manipulation.  The claimant is able to sit for six hours in an eight hour workday with normal breaks and stand and/or walk for six hours in an eight hour workday with normal breaks.  She must be able to change positions as needed throughout the day .  (T. 24).

As previously discussed, the ALJ failed to properly assess plaintiff's credibility.

Accordingly, the Court finds that the record lacks substantial evidence to support the ALJ's

---

[19] Plaintiff does not cite to any caselaw in support of this argument.

16

assessment of plaintiff's RFC.[20]   Therefore, the Court remands this matter for an analysis of plaintiff's RFC in accordance with the Regulations.

### C.  Vocational Expert

Plaintiff argues that the ALJ's failure to properly assess plaintiff's RFC rendered the vocational expert's testimony "incomplete". (Dkt. No. 7, p. 12).  The Commissioner argues that the hypothetical presented to the ALJ was complete and supported by substantial evidence. (Dkt. No. 11, p. 12-13).

At the fifth step of the sequential evaluation of disability, the Commissioner bears the responsibility of proving that plaintiff is capable of performing other jobs existing in significant numbers in the national economy in light of plaintiff's residual functional capacity, age, education, and past relevant work.  20 C.F.R. §§ 416.920, 416.960.  Ordinarily, the Commissioner meets his burden at this step "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)." *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  Sole reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's limitations.  *Id*. at 606.  For example, use of the grids as the exclusive framework for making a disability determination may be precluded where plaintiff's physical limitations are combined with non-exertional impairments which further limit the range of work she can perform.  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).  In these circumstances, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Bapp*, 802 F.2d at 603; *see also Melchior v. Apfel*, 15 F. Supp. 2d 215, 58 (N.D.N.Y. 1998) (stating "where nonexertional

---

[20] The Court notes that plaintiff's argument regarding the ALJ's RFC determination is vague.  Plaintiff does not argue that the ALJ violated or misapplied any Regulation or otherwise committed legal errors.

17

limitations significantly diminish the ability to perform a full range of work, it is appropriate that the ALJ present testimony from a vocational expert").

A hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony. *Bosmond v. Apfel*, 1998 WL 851508, at *8 (S.D.N.Y. 1998) (citation omitted); *see also De Leon v. Secretary*, 734 F.2d 930, 935 (2d Cir. 1984). If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability. *Melligan v. Chater*, 1996 WL 1015417, at *8 (W.D.N.Y. 1996).

As discussed above, the ALJ failed to properly analyze plaintiff's credibility. Therefore, the record lacks substantial evidence to support the ALJ's assessment of plaintiff's RFC. Consequently, the hypothetical questions posed to the vocational expert was not supported by substantial evidence and the ALJ erred when he relied upon the expert's response. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981) (stating that testimony of a vocational expert is only useful if it addresses the particular limitations of the claimant).

**VI.   CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits be **REVERSED** and this matter be **REMANDED** to the Commissioner, pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with the above; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED**, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is

18

further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated: February 18, 2009
Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge